IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
ST. JOSEPH DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　Plaintiff,<br><br>　v.<br><br>RYAN A. RUCKMAN,<br>[DOB: 02/25/1956]<br><br>　　　　　　Defendant. | Case No.<br><br>**COUNTS ONE and TWO:**<br>**18 U.S.C. §§ 1014 and 2**<br>Loan Application Fraud<br>NMT 30 Years Imprisonment<br>NMT $1,000,000 Fine<br>NMT 5 Years Supervised Release<br>Class B Felony<br><br>**COUNTS THREE through EIGHT:**<br>**18 U.S.C. § 1014**<br>Loan Application Fraud<br>NMT 30 Years Imprisonment<br>NMT $1,000,000 Fine<br>NMT 5 Years Supervised Release<br>Class B Felony<br><br>**Allegation of Forfeiture**<br>18 U.S.C. § 981(a)(1)(C), 28 U.S.C. § 2461(c), and 18 U.S.C. § 1956(c)(7)<br><br>$100 Mandatory Special Assessment per Count |

## INDICTMENT

THE GRAND JURY CHARGES THAT:

## INTRODUCTION

**The Department of Agriculture's Federal Crop Insurance Corporation, Direct and Counter-Cyclical Payment, and SURE Programs**

**Multiple Peril Crop Insurance**

　　1.　　The United States Department of Agriculture (USDA) is a department of the United States that was established to support the production of agriculture. Congress passed the Federal

Crop Insurance Act (FCIA) "to promote the national welfare by improving the economic stability of agriculture through a sound system of crop insurance." To carry out this purpose, Congress created the Risk Management Agency (RMA), which is an agency of the USDA; and the Federal Crop Insurance Corporation (FCIC), which is a wholly-owned government corporation, to administer the FCIA, all for the purpose of providing government insurance against unavoidable crop losses.

2. Congress authorized FCIC to utilize private insurance companies in providing crop insurance to the nation's farmers. These private insurance companies sell and service Multiple Peril Crop Insurance (MPCI) polices to farmers. FCIC reinsures MPCI policies sold by private insurance companies to farmers. Great American Insurance Group, based in Cincinnati, Ohio, is one such private insurance company which insured the crops in this matter. Gage's Insurance Agency, Stanberry, Missouri, is a local insurance agency which sells and administers Great American Insurance Group policies and others in northwest Missouri and southern Iowa. Shannon Craig was a local agent for Gage's Insurance Agency. The MPCI program provides insurance coverage to farmers against natural crop losses. FCIC reimburses private insurance companies for indemnity payments made to policyholders in accordance with the terms and conditions of a reinsurance agreement between FCIC and the insurance companies.

3. In order to obtain MPCI coverage, a farmer signs an application for crop insurance. In this instance, a separate application was signed for each state which listed the counties in which the insured crop was intended to be planted and for which the insurance was purchased. A policy is established on a County-by-County basis according to Federal Regulations, and actuarial tables.

4. The Application is an agreement between the insurance company and the insured farmer. The Application shows the level of coverage selected by the farmer. In return for payment of the premium, and subject to all the provisions in the policy, the insurance company agrees to provide crop insurance to the farmer. Insurance coverage applies only to the crop share of the person, partnership, or corporation named in the Application.

5. Provided the information on the Application is true and complete, the insurance company accepts the Application and issues a policy to the insured farmer. MPCI covers a person's share of an insurable crop as a landlord, owner-operator, or tenant, who must have an insurable interest in the crop produced. In order for a farmer to have an insurable interest in the crop, that person must have a "bona fide interest" by receiving a share (all or part of a crop) at the time coverage begins. An owner-operator, tenant, or sharecropper, is a person who: (a) produces the crop, (b) exercises managerial control relating to producing and marketing the crop, (c) makes credit arrangements; and (d) owns farming equipment, makes arrangements to obtain equipment, or hires custom work. The authority to establish crop insurance eligibility for the farmer is stated in the terms and conditions of the crop insurance policy and approved loss adjustment procedures.

6. Annually, an insured farmer must report all planted acreage of the farmer's insured crop in which the farmer has an interest or share, by the acreage-reporting deadline. Once completed, the farmer, who certifies that the information on the Acreage Reporting Form is true and complete, signs the Acreage Reporting Form. The Acreage Reporting Form shows the farmer's Actual Production History (APH) and the fields(s) to be covered by MPCI. The APH is based on the farmer's production reports. The production and planted acreage must be certified and submitted to his MPCI agent every year in order to accurately update the APH.

7. When a properly insured crop is damaged by an event covered by the policy, the farmer must certify on a Production Worksheet, the specific interest that the farmer has in the insured crop; the cause of damage to the insured crop; and the amount of harvested production. The farmer represents this information is true and complete. The information on the Production Worksheet is used to determine the amount of loss to the insured crop.

**The Direct and Counter-cyclical Payment Program**

8. The Direct and Counter-cyclical Payment Program (DCP) of the USDA provides payments to eligible producers on farms enrolled for, but not limited to, the 2008 through 2012 crop years. There are two types of DCP payments -- direct payments and counter-cyclical payments. Both are calculated using the base acres and payment yields established for the farm. DCP was re-authorized by the Food, Conservation, and Energy Act of 2008 (the 2008 Farm Bill) and is administered by the Farm Service Agency (FSA), an agency of the USDA. Some of the commodities eligible for DCP payments are wheat, corn, grain sorghum, cotton, soybean, long and medium grain rice.

9. In order to be eligible to receive payments in the DCP Program, an applicant must be "actively engaged in farming" which means that a producer had to provide at least fifty percent of one or more items on each side of the following chart:

| LAND | MANAGEMENT |
|---|---|
| CAPITAL | LABOR |
| EQUIPMENT | |

10. For cash renters of land, there is an additional requirement to be eligible for DCP payments when the landowner does not have a share or interest in the crop. To meet that additional requirement, the cash-rent tenant is also required to provide at least fifty percent of equipment and management, or fifty percent of labor.

4

11. There are direct and counter-cyclical payment limitations that each eligible "person" can obtain annually which were also determined by the 2008 Farm Bill. For an individual or entity to be considered a separate "person," the individual or entity must: have a separate and distinct interest in the land or crop involved, exercise separate responsibility for this interest, and maintain funds or accounts separate from that of any other individual or entity for this interest. The annual payment limitation for direct payments is $40,000 for each eligible person. The annual payment limitation for counter-cyclical payments is $65,000 for each eligible person.

12. The Commodity Credit Corporation (CCC) is a Government-owned and operated entity that was created to stabilize, support, and protect farm income and prices. CCC also helps maintain balanced and adequate supplies of agricultural commodities and aids in their orderly distribution. The CCC Charter Act, 62 Stat.1070; 15 U.S.C. 714, as amended, aids producers through loans, purchases, payments, and other operations, and makes available materials and facilities required in the production and marketing of agricultural commodities. Direct and Counter-cyclical payments are made by the CCC to eligible producers.

**SURE**

13. The Supplemental Revenue Assistance Program (commonly known as SURE) provides financial assistance for crop production and quality losses due to a natural disaster. The SURE program was authorized by the 2008 Farm Bill and is administered by FSA, an agency of USDA. Producers in counties farmed during the crop years covered in this indictment and declared agriculture disaster areas by the Secretary of Agriculture were eligible for assistance to cover revenue losses under the SURE program. Production submitted to the producer's crop

5

insurance provider was used to assist in calculating the SURE payment which is capped at $100,000 per person for each crop year.

### Defendant's Business

14. At all times relevant, Ryan A. Ruckman (defendant) owned and operated farms and related businesses in the Western District of Missouri in Gentry, Davies, Nodaway, Worth and Harrison Counties, Missouri, and the southern Iowa counties of Ringgold, Wayne, Decatur and Page, including, but not limited to Ryan Ruckman, Ruckman Farms, Inc., and Ryan Sales and Service, Inc.

15. For the 2008 Crop year, defendant applied for and received SURE payments, DCP subsidy payments and MPCI subsidy and indemnity payments for the Ryan Ruckman, Ruckman Farms, Inc., Ryan Sales and Service, Inc., and Case Ruckman.

16. The farms or land on which the crops in this matter were planted during crop year 2008 are the located in Gentry and Harrison Counties, Missouri, and the southern Iowa counties of Wayne, and Decatur. Locations are identified by 2008 FSA Report of Commodities (FSA-578) and the 2008 MPCI Acreage Report for policy numbers 1031241 and 1031243 all submitted in the name of Case Ruckman. Hereafter "crops" or "the crops" refers to the crops produced on these farms during the crop year 2008.

17. At all times relevant, in 2008 Case Ruckman, son of the defendant, was a full-time student at Logan University College of Chiropractic, in St. Louis, Missouri.

18. At all times relevant to this Indictment Case Ruckman was not "actively engaged in farming". Case Ruckman did not provide the land (nor was a cash renter of the land), management, capital, labor, or equipment for the crops, or any aspect of the production operation of the crops.

6

19. Defendant made all of the business and financial decisions regarding the production of the crops.

**Defendant's Scheme to Illegally Obtain FSA Benefits**

20. In or around the year 2007 and continuing to 2012, the exact date being unknown, the defendant devised a scheme to place crop ownership/production in Case Ruckman's name to increase the number of "persons" eligible for FSA benefits and financially benefit the defendant.

21. In or around February 2007 and continuing until May 2010, the defendant submitted documentation to, but not limited to the FSA, GAIG, and FCIC to provide the appearance that Case Ruckman was the producer of the crops and to conceal the fact that the defendant was the actual producer of the crops.

22. From approximately 2007 to 2010, defendant caused to be submitted FSA contracts and other documents, including, but not limited to Forms CCC-509, CCC-502A, FSA-578, FSA-682, FSA-683 that identified Case Ruckman as the sole producer of the crops and therefore should receive one hundred percent of the FSA benefit payments for the crops in crop year 2008. The defendant, not Case Ruckman, was the producer of the crops and he received, accessed, and obtained approximately $27,133 in DCP payments paid as well as $100,000 in SURE payments made by CCC to Case Ruckman.

**Manner and Means**

23. To provide the appearance that Case Ruckman was "actively engaged in farming" and had an insurable share in the crops, defendant engaged in a number of activities, including, but not limited to the following:

    a. Defendant reported to FSA that Case Ruckman was farming as a separate person and had 100% interest/share in the crop production.

    b. With the aid of Shannon Craig, defendant signed Case Ruckman's name to and submitted crop insurance and related documents, including two Great

  American Insurance Group Multiple Peril Crop Insurance applications/acreage reports which falsely stated Case Ruckman had 100% interest/share in the crop production.

 c. Defendant signed as Power of Attorney for Case Ruckman on documents that pertained to FSA, crop insurance, and bank records for Case Ruckman.

 d. In 2008, defendant obtained annual farm operating loans related to the production of the crops in the amount of approximately $2.9 million from Midstates Bank. These loan proceeds were deposited in the Midstates Bank checking account that defendant controlled. The defendant executed an assignment of indemnity for crop insurance proceeds paid by Great American Insurance Group to be paid in the name of Case Ruckman to Midstates Bank to cover the defendant's operating loans for the crops. Case Ruckman was not a party to the loans nor was he an account holder on any accounts at Midstates Bank.

**Defendant's Scheme to Illegally Obtain Crop Insurance, Subsidies, and Indemnity Payments through Multiple Peril Crop Insurance (MPCI)**

24. Between 2007 and 2012, defendant devised a scheme to obtain MPCI coverage on the crop production in the name of Case Ruckman. Defendant obtained MPCI coverage from Great American Insurance Group by falsely stating on insurance documents that Case Ruckman had an 100% insurable interest (share) in the crop. In fact, defendant owned the crop and Case Ruckman did not have an insurable or "bona fide interest" in the crop produced. Defendant produced the crops, exercised managerial control, and made credit arrangements, pertaining to the crop production.

**Manner and Means**

25. Between 2008 and 2010, defendant caused to be submitted documents to the crop insurance companies for crop insurance coverage and crop losses for Case Ruckman for crop year 2008. As a result, indemnity payments totaling $546,105 were issued to Case Ruckman. These payments were reimbursed by the FCIC. Additionally, for the crop year 2008, the FCIC paid $89,029 in premium subsidies and $33,668 in administrative costs to the insurance companies on

8

behalf of Case Ruckman. In total, the fraudulent cost to the government was $668,802 for indemnity payments, premium subsidies, and administrative subsidies paid on behalf of Case Ruckman.

26. On March 17, 2008, to obtain the Multiple Peril Crop Insurance from Great American Insurance Group in Case Ruckman's name, defendant met with Great American Insurance Group Agent, Shannon Craig, in the Western District of Missouri and signed Case Ruckman's name on the Power of Attorney for Great American Insurance and on two applications for crop insurance from Great American Insurance Group stating that Case Ruckman had a 100% share in the insured crops and that Case Ruckman had a viable insurable interest in the crop.

27. On or about November 7, 2008, the defendant, submitted a loss to Shannon Craig at Gage's Insurance Company which caused a "Notice of Damage or Loss" to be forwarded by Gage's Insurance Agency to Great American Insurance Group. Defendant identified Case Ruckman as an insured party who suffered the crop loss or damage for the purpose of securing an indemnity payment for the reported loss knowing that Case Ruckman was not then a person entitled to receive any such payment, the said statement being material to the lawfulness of the payment of a $546,105 indemnity payment in the name of Case Ruckman.

28. On or about February 3, 2009, defendant changed his grain contracts with Bartlett Grain Company replacing his name with Case Ruckman's name so that the name listed on the sold production would match the name listed on Great American Insurance Group's policy when the crop insurance adjuster asked for production records.

29. On or about February 18, 2009, the defendant filed with Great American Insurance Group Multiple Production Worksheets in which the defendant falsely represented Case Ruckman had 100% share of the crop and/or was to receive 100 % share of the sale of the crop.

30. On or about March 2009, Great American Insurance Group indemnity checks for Case Ruckman and Midstates Bank were sent to Gage Insurance Agency, South 105 High Street, P.O. 100, Stanberry, Missouri, 64489-0100. Subsequently the checks were delivered to the defendant in person or at his residence 2959 State Highway C, Albany, 64402. The total indemnity payment was $546,105; however, the actual amount of the indemnity checks sent to Case Ruckman were $469,041 subtracting the producer premium, interest and fee credits.

31. On March 10 and March 19, 2009, two indemnity checks totaling $469,041 were deposited into the Ryan and Ciarra Ruckman's account number xxxxx5649 at Midstates Bank, Harlan, Iowa.

32. On or about March 19, 2009, approximately $650,000 was transferred from account number XXXX5649 Midstates Bank, Harlan, Iowa, and applied to Ryan's 2008 farm operating loan ending in XXXX4477 at Midstates Bank.

33. On March 10, 2016, Shannon Craig pled guilty to an Information charging him with a violation of 18 U.S.C 1014 and 2 for the aiding and abetting in the making of false statements on a loan or credit application related to Federal Crop Insurance, in connection with his actions submitting insurance claims for defendant.

34. Losses in this matter incurred by FCIC due to payments from payouts to Great American Insurance Group through Multiple Peril Crop Insurance program and by the FSA through Direct and Counter-cyclical Payment Program, and SURE programs, are approximately $795,935.

## COUNTS ONE THROUGH EIGHT – FALSE STATEMENT

Paragraphs 1 through 34 are re-alleged here and incorporated by reference to the Counts below.

On or about the dates below, in the Western District of Missouri, Ryan A. Ruckman, defendant, aided and abetted by others as to Counts 1 and 2, did knowingly make a material false statement for the purpose of influencing the action of the FCIC, and Great American Insurance Group (GAIG), a company the FCIC reinsures, and FSA, a successor agency of the Farmer Home Administration, which caused the listed agency to make improper distribution payments or benefits in the name of Case Ruckman which Case Ruckman was not entitled to receive. All in violation of Title 18, United States Code § 1014 and 2 as to Counts 1 and 2; and Title 18, United States Code § 1014 on Counts 3 through 8. The specific allegations are outlined in the chart below:

| Count | Date | Gov't agent or agency influenced | Document(s) submitted | False Statement |
|---|---|---|---|---|
| 1 | March 17, 2008 | FCIC & Great American Insurance Group (GAIG) | GAIG Multiple Peril Crop Insurance application on GAIG policy number 1031241 | Case Ruckman was to be the person who had an insurable interest or share in the crops; Case Ruckman was farming the property, and entitled to receive any indemnity |
| 2 | March 17, 2008 | FCIC & Great American Insurance Group (GAIG). | GAIG Multiple Peril Crop Insurance application on GAIG policy number 1031243 | Case Ruckman was to be the person who had an insurable interest or share in the crops; Case Ruckman was farming the property, and entitled to receive any indemnity |
| 3 | July through August 2008 | FSA | multiple Report of Commodities (Form FSA-578) | Case Ruckman was the farmer of the property and had 100% share of the crop when in fact the defendant was the true farmer of the property |

| | | | | and had 100% share in the crop. |
|---|---|---|---|---|
| 4 | August 15, 2008 | FCIC & Great American Insurance Group (GAIG) | multiple MPCI Acreage Reporting Forms | Case Ruckman had 100% share of the crop and/or was to receive 100 % share of the sale proceeds of the crop. |
| 5 | July through August 2008 | FSA | Direct and Counter-Cyclical Program contracts (Form CCC-509) | Case Ruckman was eligible for a share of the DCP payments in Gentry and Harrison Counties, Missouri, for the 2008 crop year |
| 6 | August 28, 2008 | FSA | Farm Operating Plan for Pay Eligibility Review For an Individual (Form CCC-502A) | Case Ruckman provided 100% of the capital and 100% labor for 2008 crop year |
| 7 | February 18, 2009 | FCIC & Great American Insurance Group (GAIG). | multiple Production Worksheets | Case Ruckman had 100% share of the crop and/or was to receive 100 % share of the sale proceeds of the crop |
| 8 | April 14, 2010 | FSA | Supplemental Revenue Assistance Payments Program Application (Form FSA-682); Statement of Compliance with Program Provisions of the 2008 Supplemental Revenue Assistance Payments (SURE) Program and Waiver of Finality of Payment Provisions" (Form FSA-683) forms | Case Ruckman was the producer of the crop and eligible to receive the 2008 SURE program payments |

## ALLEGATION OF FORFEITURE

The allegations contained in Count One through Eight of this Indictment are hereby re-alleged and incorporated by reference for the purpose of alleging forfeiture pursuant to Title 18,

United States Code, Section 981(a)(1)(C), Title 28, United States Code, Section 2461(c), and Title 18, United States Code, Section 1956(c)(7).

Upon conviction of the offense in violation of Title 18, United States Code, Sections 1014 and 2, as set forth in Counts One through Eight of this Indictment, the defendant, Ryan A. Ruckman, shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 981(a)(1)(C), Title 28, United States Code, Section 2461(c), and Title 18, United States Code, Section 1956(c)(7), any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offenses.

If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third party;

    c. has been placed beyond the jurisdiction of the Court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States to seek forfeiture of any other property of said defendant up to the value of the forfeitable property described above.

    A TRUE BILL.

    ___/s/ Laurie A. Payne_____
    FOREPERSON OF THE GRAND JURY

__/s/ Gregg R. Coonrod_____
Gregg R. Coonrod
Senior Litigation Counsel

Dated: ___1/31/17_____    Kansas City, Missouri